**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | Criminal Action No. 13-cr-134 (BAH) |
| | |
| ALFREDO MOSQUERA-MURILLO, and | Chief Judge Beryl A. Howell |
| ANTONIO MORENO-MEMBACHE, | |
| Defendants. | |

## MEMORANDUM OPINION

On September 14, 2018, the D.C. Circuit's mandate issued remanding this case for

resentencing of all three defendants, Alfredo Mosquera-Murillo ("Murillo"), Joaquin Chang-

Rendon ("Rendon"), and Antonio Moreno-Membache ("Membache"), *see* Mandate, ECF No.

266, upon holding that the defendants' convictions for violations of the Maritime Drug Law

Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70503 and 70506(b), did not bar their eligibility for

safety-valve relief, under 18 U.S.C. § 3553(f), *see United States v. Mosquera-Murillo*, 902 F.3d

285, 292, 296 (D.C. Cir. 2018).[1]  The D.C. Circuit vacated the defendants' sentences and

directed on remand that the Court "consider whether the defendants meet the five remaining

---

[1]  When the defendants' original sentences were imposed, MDLEA offenses were not enumerated as covered by 18 U.S.C. § 3553(f).  *See United States v. Mosquera-Murillo*, 172 F. Supp. 3d 24, 29 (D.D.C. 2016) ("By its terms, the safety-valve provision allows for a below-minimum sentence only 'in the case of an offense under' certain enumerated federal drug crimes.  Based upon the clear text in 18 U.S.C. § 3553(f), these enumerated statutes—21 U.S.C. §§ 841, 844, 846, 960 and 963—have been interpreted to be an exhaustive list.").  Indeed, prior to the D.C. Circuit's holding in this case, the other three circuits to consider the issue had concluded, based on the statutory text of 18 U.S.C. § 3553(f), that defendants convicted under MDLEA offenses were not eligible for safety-valve relief.  *See, e.g.*, *United States v. Anchundia-Espinoza*, 897 F.3d 629, 633–34 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1291 (mem) (2019); *United States v. Pertuz-Pertuz*, 679 F.3d 1327, 1328 (11th Cir. 2012) (per curiam); *United States v. Gamboa-Cardenas*, 508 F.3d 491, 495–97 (9th Cir. 2007).  As amended by the First Step Act of 2018 ("First Step Act"), enacted on December 21, 2018, § 3553(f) now expressly includes MDLEA offenses in the list of covered offenses.  *See* Pub. L. No. 115-391, § 402(a)(1)(A), 132 Stat. 5194.

safety-valve requirements." *Id.* at 296.[2]  The defendants are scheduled to be resentenced on July 18, 2019.  Min. Entry (June 6, 2019).

If ineligible for safety-valve relief, each defendant would receive the same sentence previously imposed: 120 months' imprisonment, which is the applicable mandatory minimum sentence that the Court agreed to impose upon acceptance of the defendants' plea agreements, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), on each defendant's guilty plea to one count of conspiring to distribute, and possess with intent to distribute, at least 5 kilograms of cocaine and 100 kilograms of marijuana on board a vessel subject to the jurisdiction of the United States, in violation of the MDLEA, 46 U.S.C. §§ 70503, 70506(b) and 21 U.S.C. §§ 960(b)(1)(B), (b)(2)(G).  *See* Plea Agreements ¶¶ 1, 6, ECF Nos. 185, 191.  Upon satisfaction of the five safety-valve requirements, the appropriate sentence to be imposed at or below the mandatory minimum of 120 months' incarceration would be based upon consideration of the factors set out in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3553(f) ("[I]f the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation," that the defendant meets the safety-valve requirements, then "the court shall impose a sentence pursuant to [the] guidelines . . . without regard to any statutory minimum sentence.").  The safety-valve thus "permit[s] a narrow class of defendants, those who are the least culpable

---

[2]  The safety valve requirements are: (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines; (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.  18 U.S.C. § 3553(f) (2018); U.S.S.G. § 5C1.2(a).  The First Step Act amended the safety-valve requirement concerning criminal history points, *see* Pub. L. No. 115-391, § 402(a)(1)(B), 132 Stat. 5194, but this amendment only applies to convictions entered on or after December 21, 2018, and, in any event, has no effect on the defendants' eligibility for safety-valve relief.

participants in [the] offense[], to receive strictly regulated reductions in prison sentences for mitigating factors currently recognized under the federal sentencing guidelines." H.R. REP. NO. 103-460 (1994).

The parties vigorously dispute the requisite scope of information Murillo and Membache would have to provide to satisfy the fifth requirement for safety valve eligibility, *see* Jt. Status Rept., dated Mar. 1, 2019 ("Mar. 2019 JSR") at 3–5, ECF No. 273, but resolution of that dispute would be unnecessary if these defendants also fail to satisfy other eligibility requirements. Consequently, an evidentiary hearing was held on June 12 and 13, 2019 to determine whether Murillo or Membache were ineligible for safety-valve relief due to their failure to satisfy other requirements, namely: because they were "organizer[s], leader[s], manager[s], or supervisor[s] of others in the offense," 18 U.S.C. § 3553(f)(4), or because Membache "possess[ed] a firearm or other dangerous weapon . . . in connection with the offense," *id.* § 3553(f)(2). The evidence presented at that hearing, together with the record in this case, including supplemental memoranda filed after the hearing, demonstrates that neither Murillo nor Membache is eligible for safety-valve relief for the reasons outlined below.[3]

---

[3] Resolution of this issue has been delayed due to supplemental briefing on Membache's behalf that was filed over two weeks after the court-ordered deadline. The government was ordered to file, by June 14, 2019, a comprehensive review of the foundation for the identification of the speakers in the transcripts it introduced at the evidentiary hearing, with any response from Membache (the only defendant who expressed interest in responding), due by June 18, 2019. *See* Min. Entry (June 13, 2019). Murillo submitted a timely post-hearing response to the government's review on June 16, 2019. Murillo Response to Gov't's Review ("Murillo Resp."), ECF No. 292. Membache sought and received, *nunc pro tunc*, an extension to file a response on June 21, 2019, but failed to file by this date. *See* Min. Order (June 19, 2019). Without seeking a further extension, Membache waited until July 1, 2019 to file his response to the government's review. *See* Membache Resp. to Gov't's Review, ECF No. 295 (sealed). Then, on July 2, 2019, Membache filed a 20-page Post-Hearing Memorandum recapitulating his objections to the evidence presented at the hearing. *See* Membache Post-H'rg Memo, ECF No. 296 (sealed). Notwithstanding the flagrant disregard of the Court's deadlines, Membache's filings have been considered.

## I.    BACKGROUND

The indictment in this case was filed on May 9, 2013 and originally charged five defendants with conspiring, in violation of the MDLEA, to distribute, and possess with intent to distribute, at least 5 kilograms of cocaine and 100 kilograms of marijuana on board a vessel subject to the jurisdiction of the United States. *See* Indictment at 1–2, ECF No. 1. While Colombia denied the United States' extradition request for two of the defendants, William Obando-Gonzalez ("Obando") and Carlos Ivan Ortega-Tello ("Tello"), *see* Gov't's Mot. to Dismiss Indictment at 2, ECF No. 26; Order Granting Motion to Dismiss Indictment, ECF No. 28, the three remaining defendants were extradited and entered guilty pleas, on January 20, 2016, reserving their right to contest on appeal their eligibility for relief from the statutory mandatory minimum under the safety-valve provision, 18 U.S.C. § 3553(f). *See* Plea Agreements ¶¶ 6, 14. As noted, the D.C. Circuit concluded that MDLEA convictions did not preclude eligibility for safety-valve relief. *Mosquera-Murillo*, 902 F.3d at 292, 296.

On remand, the parties raised a myriad of issues regarding the quantity of drugs at issue, the applicability of various specific offense characteristics for bribery of a law enforcement officer and involvement of a minor in the charged conspiracy, under U.S.S.G. §§ 2D1.1(b)(1), (11), (15)(B), the scope of relevant conduct pertinent to resentencing, Murillo and Membache's roles in the offense, and the extent to which the plea agreement terms barred the government from making a recommendation as to any of these issues. *See generally* Jt. Status Rept., dated Nov. 19, 2018 ("2018 JSR"), ECF No. 271. A number of these issues had either been resolved or were extraneous to the single issue required by the mandate to be resolved at resentencing, prompting the Court to issue a Memorandum and Order "[t]o re-focus the parties" on the "single issue" to be addressed on remand: "whether any defendant meets the five safety-valve

requirements, listed in 18 U.S.C. § 3553(f) and incorporated verbatim into the U.S. Sentencing Guidelines, U.S.S.G. § 5C1.2(a)," and "the only means by which any defendant may obtain a different sentence than that already imposed." Mem. & Order, dated Nov. 30, 2018, at 2–3, ECF No. 272.

The parties initially focused on resolving whether any defendant met the fifth requirement for safety-valve relief by "truthfully provid[ing] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan," 18 U.S.C. § 3553(f)(5); *see also* U.S.S.G. § 5C1.2(a)(5) (incorporating statutory safety-valve requirements, as they existed prior to the First Step Act, verbatim into the U.S. Sentencing Guidelines Manual), and the defendants sought clarification regarding the requisite scope of any proffer, Mar. 2019 JSR at 3–5. Irrespective of the truthfulness or completeness of any proffer, however, the government contended that Murillo and Membache were ineligible for safety-valve relief because they failed to satisfy other safety-valve requirements. 2018 JSR at 2, 6; Mar. 2019 JSR at 6; Rough Transcript of Hearing (Mar. 8, 2019) ("Mar. 8 H'rg Tr. (Rough)") at 18:10–23:3.[4] Specifically, the government contended that these two defendants played a managerial or supervisory role with respect to the charged conspiracy involving the interdicted vessel, the *Mistby*, *see* 18 U.S.C. § 3553(f)(4); U.S.S.G. § 5C1.2(a)(4), and that Membache possessed a dangerous weapon in connection with this charged conspiracy, *see* 18 U.S.C. § 3553(f)(2); U.S.S.G. § 5C1.2(a)(2). The parties were therefore directed to prepare for an evidentiary hearing solely focused on those two eligibility requirements under § 3553(f)(2) and (4), deferring further argument on the requisite scope of any proffer. Mar. 8 H'rg Tr. (Rough) at 18:10–23:3; *id.* at 24:12–25 (Court directing the parties "to

---

[4]     All citations to hearing transcripts cite to a rough draft of the transcript unless a final transcript is available. Discrepancies in page numbers between the rough and any final transcript may exist.

focus on expeditiously and efficiently resolving this case, beginning with the single issue in front of me: are these defendants safety valve eligible? And if the government has evidence that meets its burden by a preponderance of the evidence that they were managers or supervisors in the *Mistby* operation . . . they are just not eligible"); *id*. at 39:17–25 (Membache's counsel agreeing that it makes sense to hold a limited evidentiary hearing on these two requirements); *id*. at 40:10–20 (Murillo's counsel indicating he "absolutely understand[s]" why the Court wants to hold an evidentiary hearing as to the two requirements and indicating that he "think[s] it's a good idea").[5]

To further focus the parties on the issues at stake in any resentencing, they were directed to submit a Joint Status Report providing "for each defendant, the parties' calculations of the applicable advisory Guidelines range, assuming the defendant is deemed eligible for safety-valve relief and is sentenced based on the 220 kilograms of cocaine and 235 kilograms of marijuana recovered from the *Mistby* . . . with no other special offense characteristics." Min. Order (Mar. 8, 2019). The government estimated that the applicable advisory Guidelines range for each defendant would be 121 to 151 months' imprisonment, slightly above the 120-month-sentence imposed under their plea agreements. *See* May 2019 JSR at 3. While Murillo accepted the government's calculation as accurate based on the Court's prior rulings as to the effect of the

---

[5]     The third defendant, Rendon, for whom only the proffer requirement for safety-valve relief is at issue, has provided to the government only written proffers, which the government has concluded fail to truthfully provide all information and evidence Rendon has, as necessary to meet the fifth safety-valve requirement. *See* Jt. Status Rept., dated May 2, 2019 ("May 2019 JSR") at 6–7, ECF No. 275 (Rendon has "provided information in written form" and, in response to the government's "offer[] to transfer [him] to the Washington, D.C. area for an in-person proffer," "chose to continue to proceed by letter due to difficulties associated with seeking a prisoner transfer while awaiting medical treatment by the Bureau of Prisons"); Jt. Status Rept., dated May 28, 2019, ECF No. 277 (government noting that it continues to believe that Rendon does not meet the fifth requirement). As directed, Rendon notified the Court that he contests his eligibility for safety-valve relief, *see* Rendon Status Rpt., dated July 8, 2019, ECF No. 302, and included a summary of information he has proffered, *see* Mot. to Seal, Ex. A ("Rendon Proffer"), ECF Nos. 303-1, 306 (sealed). An evidentiary hearing, as requested by Rendon, is scheduled for July 16, 2019. *See* Min. Order (June 6, 2019); Notice of H'rg (July 8, 2019).

plea agreement, *see id.* at 1 n.1, Rendon argued that he would be eligible for a mitigating role downward adjustment, putting him in an advisory Guidelines range of 57 to 71 months' imprisonment, *id.* at 3–4, and Membache argued, in direct contravention of prior rulings as to the effect of his plea agreement, that he should not be held responsible for all of the drugs on the *Mistby* and that he should receive a mitigating role downward adjustment, which would result in an advisory Guidelines range of 41 to 51 months' imprisonment, *id.* at 4–6.

At the outset, the D.C. Circuit has observed that "the safety valve's basic purpose [is to] spare certain minor participants in drug trafficking enterprises from mandatory minimum sentences when imposition of the mandatory sentences would be *disproportionate to the defendants' culpability.*" *In re Sealed Case (Sentencing Guidelines' "Safety Valve")*, 105 F.3d 1460, 1462–63 (D.C. Cir. 1997) (emphasis added). Notwithstanding the disparate guideline ranges urged by the parties, in assessing "the defendants' culpability," the entire record in this case relating to the defendants' offenses and relevant conduct is considered, starting with their admission to being "a member of a drug trafficking organization ('DTO') between January 2012 and [] February 2013, which manufactured, stored, and transported large quantities of cocaine and marijuana in Colombia that would be later illegally imported into Panama. . . . through the use of 'go-fast' boats launched from the coast of Colombia," and the defendants' further concession that "[t]he Government can prove beyond a reasonable doubt that: … United States law enforcement personnel . . . recovered [from the interdicted *Mistby*] over 220 kilograms of cocaine and 235 kilograms of marijuana that had been jettisoned into the water." Murillo Jt. Statement of Facts ("Murillo SOF") ¶¶ 1, 4, ECF No. 186; Membache Jt. Statement of Stipulated Facts ("Membache SOF") ¶¶ 1, 3, ECF No. 192; *see* 46 U.S.C. §§ 70503, 70506. The record also includes the statements of five cooperating defendants that both Murillo and Membache

have a long-running history in drug-trafficking—a history that is not reflected in any defendant's criminal history score or in the quantity of narcotics attributable to each defendant as a result of the *Mistby* interdiction. *See* Gov't's Mot. *in Limine* to Introduce Other Crimes Evidence At Trial at 4–11, ECF No. 71 (summarizing evidence of Murillo's involvement in shipments on go-fast vessels, interdicted on February 3, 2012 and March 16, 2012, with 451 kilograms and 790 kilograms of cocaine, respectively, and in June 2008 with approximately 5000 kilograms of cocaine, being transported from Colombia to Panama; and of Membache's involvement in three separate shipments of cocaine in 2011, including a go-fast vessel interdicted on November 22, 2011, containing 115 kilograms of cocaine, for which shipment Membache transported the cocaine from Buenaventura to Choco, ordered that it be hidden overnight, and organized the launch of the vessel); *see also United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 175–84 (D.D.C. 2015) (concluding the government's "evidence of certain other crimes allegedly committed by the defendants in connection with [nine] other narcotics shipments prior to and after the interdiction of the *Mistby*" is admissible because it is "probative of [the defendants'] specific pattern of partnering with each other and a common group of co-conspirators to engage in conduct on virtually a monthly basis that was substantially similar to the [*Mistby* conspiracy]" and it "demonstrate[s] how the defendants began working together and with their . . . co-conspirators as narcotics traffickers, as well as their intent, knowledge, preparation, and plan" (internal quotation marks omitted)). Based on this entire record, the Court is hard-pressed to find that a sentence of 10 years' imprisonment would be "disproportionate to" either Murillo or Membache's culpability.

At the evidentiary hearing held on June 12 and 13, 2019, the government presented testimony from Naval Criminal Investigative Service ("NCIS") Special Agent John Souchet,

who was the lead agent in the investigation of Rendon and also assisted in the investigations into Murillo and Membache. *See* Transcript of Evidentiary Hearing (June 12, 2019) ("June 12 H'rg Tr.") at 27:8–30:10, ECF No. 304; Gov't's Outline of Evidence ("Gov't's Outline") at 4–5, ECF No. 284. Souchet is a native Spanish speaker who was stationed in Colombia from 2008 to 2011 while investigating drug-trafficking organizations there. *See* June 12 H'rg Tr. at 28:9–29:7. In preparation for the evidentiary hearing, Souchet reviewed written reports of law enforcement interviews with five cooperating defendants, three of whom were crewmembers arrested on the *Mistby* when that vessel was interdicted in 2012. *See id.* at 30:14–31:24, 50:14–51:19, 54:4–56:24, 105:10–106:13.[6] He also listened to audio recordings of phone calls intercepted by the Colombian National Police ("CNP") that the government introduced at the hearing, and reviewed the transcripts of those recordings *See* Transcript of Evidentiary Hearing (Morning of June 13, 2019) ("June 13 AM H'rg Tr.") at 7:25–12:14, 14:5–19:15, 21:8–28:12, 37:4–42:22, ECF No. 305.[7]

---

[6] These law enforcement interview reports were produced to the defendants as part of discovery. *See* June 12 H'rg Tr. at 53:23–54:1. Despite relying heavily on these reports, no party sought to admit the reports as part of the record at the hearing and thus only cherry-picked portions of the reports are available to the Court. *See* Membache Post-H'rg Memo at 2–18.

[7] The final transcript for the June 13, 2019 evidentiary hearing is available for the morning session only; citations for the afternoon session are to the rough transcript. Murillo and Membache objected to the admission of Gov't's Ex. 15, consisting of a disc of ten phone calls intercepted during the course of the CNP wiretap investigation and the corresponding transcriptions of those calls, Gov't's Exs. 5–14, on grounds that the government had failed to provide sufficient foundation to support the CNP's attribution of the identities of the speakers reflected on the transcripts. *See* June 12 H'rg Tr. at 116:10–129:15. These government exhibits, and additional exhibits presented on June 13, 2019 (Gov't's Exs. 16–22) were conditionally admitted after Souchet testified that he could attest to the accuracy of the attribution of the speakers on the transcripts based on his review of the audio recordings, CNP surveillance reports, and the defendants' admissions, in the Statement of Facts supporting their pleas, that an intercepted phone call from June 19, 2012 captured Murillo and Membache discussing the seizure of the *Mistby*. *See* June 13 AM H'rg Tr. at 8:4–12:14, 14:5–19:15, 21:8–28:12, 37:4–42:22 (referring to Murillo SOF ¶ 5, Membache SOF ¶ 4, Gov't's Ex. 21 (the recording of the June 19, 2012 phone call), and Gov't's Ex. 22 (the CNP transcript of this phone call)); *see also id.* at 30:13–38:20 (limited *voir dire* by Murillo's counsel of Souchet regarding how Souchet could confirm the accuracy of the CNP's voice attributions). Supplemental filings by the government, including Souchet's sworn declaration detailing the CNP's authorization to intercept telephone numbers associated with Murillo and Membache, the steps the CNP took to conduct surveillance of Murillo, Membache, Obando, Tello, and Rendon to identify the speakers of intercepted phone calls, and Souchet's own review of the recorded phone calls and surveillance reports, bolsters the accuracy of the CNP's voice attributions reflected in the transcripts. *See* Souchet Decl., Ex. A, Gov't's Comprehensive Review of the Foundation for

The three defendants arrested on the *Mistby*, Luis Eduardo Paredes ("Paredes"), Ivan Campaz-Riascos ("Campaz"), and Andres Moreno-Membache ("Andres"), were each interviewed multiple times under cooperation agreements with the government. *See* June 12 H'rg Tr. at 50:14–51:18, 54:17–20. A brief summary of each cooperating defendant's statements to law enforcement follows.

Paredes, the captain of the *Mistby*, told law enforcement that Murillo was responsible for providing coordinates to allow the crew to travel safely and instructing them whether to launch the *Mistby*, and that he played a similar role with respect to other vessels. *See id.* at 57:10–15, 61:16–62:6. Paredes indicated that he knew about Membache's involvement with drug-trafficking prior to the *Mistby* launch, that he viewed Membache as having more authority in the DTO than his brother Andres, who was a crewmember on the *Mistby*, because of Membache's greater experience, and that Membache oversaw the transportation and storage of the cocaine that would be placed in the *Mistby* and gave advice and instructions as to whether it was safe to launch the *Mistby* and where to conceal it on shore. *See id.* at 58:21–61:15, 62:7–63:17. Paredes

Identification of Speakers in Gov't's Exs. 5–14 ("Souchet Decl.") ¶¶ 7–14 & n.3, ECF No. 290-1 (Souchet explaining that listening to Gov't's Ex. 21, the June 19, 2012 recording of Murillo and Membache discussing the *Mistby* seizure, allowed him to distinguish between Murillo and Membache's voices and to confirm that CNP's attributions were accurate as to each of the government's exhibits); *id.* ¶ 15 (explaining how Souchet confirmed that the attributions of Andres Moreno-Membache, a crewmember of the *Mistby*, were accurate). Membache objects to Souchet's procedure for confirming the voice attributions as unduly suggestive and inadequate, as Souchet "had no prior familiarity with the speakers' voices" and listened to phone calls with "transcripts in front of him that identified the alleged speakers," Membache Resp. to Gov't's Review at 3–4, and alleges that Souchet's description of the CNP's work to bolster its identification of the speakers lacked sufficient detail, *id.* at 4–5. The Court disagrees. Souchet is an experienced law enforcement agent and native Spanish speaker, who gained familiarity with the two defendants' voices based on their admitted intercepted call, which Souchet used to identify their same voices on other intercepted calls, combined with CNP's surveillance reports and photographs identifying cooperating defendants and *Mistby* co-conspirators intercepted on extensive wiretaps over a period of approximately three years, *see* Gov't's Outline at 3 (referring to length of investigation); Souchet Decl. ¶¶ 1–15, provide ample foundation for the speaker attributions on the intercepted calls and transcripts in Gov't's Exs. 4–22. Accordingly, the defense objection to the admission of these exhibits for consideration in resolving the defendants' eligibility for safety-valve relief is denied.

also stated that he had once seen Membache with a dark 9mm pistol at a planning meeting prior to the launch of the *Mistby*. *Id.* at 64:25–65:23.

Campaz, a crewmember of the *Mistby*, corroborated Paredes's statements regarding Membache. He told law enforcement that Membache had more authority in the DTO and that he had seen Membache give orders to the *Mistby* crew, including an order not to depart and to remove drugs from the *Mistby* and store them in the jungle, and he had seen what he believed to be a concealed pistol tucked into Membache's waistband at the launch site of the *Mistby*. *Id.* at 67:25–71:15; Rough Transcript of Evidentiary Hearing (Afternoon of June 13, 2019) ("June 13 PM H'rg Tr. (Rough)") at 200:14–202:21.

Andres's initial statements to law enforcement after his arrest were that that he and Membache both supervised their younger brothers in transporting cocaine through Colombia for export on go-fast vessels. *See* June 12 H'rg Tr. at 71:16–72:18. He subsequently retracted these statements, *id.* at 73:16–78:2, and indicated that Membache played no role in the *Mistby* conspiracy—an assertion belied by Membache's own allocution in this case. *See* Rough Transcript of Plea Colloquy (Jan. 20, 2016) ("Plea Colloquy Tr. (Rough)" at 32–35 (Membache explaining that "before [the *Mistby*] launched my brother asked me if I could [get] some [sailing or launching] papers that were going to come and if I could take them to him" and admitting that he knew "that the *Mistby* was going to be used to transport cocaine and marijuana," leading the Court to conclude "there is a sufficient factual basis for [Membache's] plea since he agreed that he accepted paper to help facilitate licensing in connection with the *Mistby* [and at] the same time . . . he knew [the *Mistby*] was going to be used to transport cocaine and marijuana on board the high seas"); *see also* Membache SOF ¶ 2 (agreeing that the government can prove beyond a reasonable doubt that Membache "assisted in moving [narcotics] from Buenaventura to Choco,

11

and once the cocaine and marijuana arrived in Choco, [he] assisted in hiding the drugs. When the go fast boat was ready to transport the cocaine and marijuana, he assisted in loading the drugs onto the go fast boat and otherwise ensured the boat's successful launch."). Further contradicting Andres's retraction, the government introduced several intercepted phone calls in which Andres and Membache discuss the arrest of their two younger brothers, with Membache expressing the view that one of the brothers should take the blame so that the other brother can be released. *See* Gov't's Exs. 5–7. Collectively, the phone calls between Andres and Membache corroborate other cooperating defendants' statements that Membache was aware of and played a role in supervising his brothers' drug-trafficking activities.

Intercepted phone calls between Andres and other members of the conspiracy also shed light on Murillo's role. In one phone call, Andres tells Obando, the leader of the conspiracy, that he is waiting on Murillo to launch the *Mistby*. *See* Gov't's Ex. 12. Additional phone calls record Andres and Murillo, and then Murillo and Membache, discussing a plan for Murillo to sell some of his marijuana to be ultimately transported on the *Mistby*. *See* Gov't's Exs. 8–10.

That Murillo and Membache played these roles with respect to the *Mistby* is further corroborated by their similar roles in other illegal narcotics shipments, as indicated by interviews with two cooperating defendants arrested in connection with the interdiction of go-fast boats other than the *Mistby*. One of those defendants, Hector Pozmino-Jezken ("Pozmino"), a crewmember of an unnamed go-fast vessel interdicted prior to the *Mistby*, told law enforcement in post-arrest interviews that he had observed Murillo, at a planning meeting prior to the launch of the vessel, plotting locations of naval patrols using nautical charts and a Global Positioning System ("GPS") he brought to the meeting, and using that information to create a safe route for the vessel. *See* June 12 H'rg Tr. at 80:22–89:2. As for Membache, Pozmino, who had known

12

Membache for three years prior to Pozmino's arrest, corroborated the *Mistby* co-conspirators' statements that Membache oversaw his younger brothers in transporting cocaine through Colombia and also supervised a second crew responsible for specific shipments of cocaine. *See id.* at 99:5–104:11.

The last and fifth cooperating defendant, Jimy Gonzalez-Membache ("Gonzalez"), who was a crewmember on a go-fast vessel interdicted prior to the *Mistby*, corroborated the other cooperating defendants' accounts that Murillo plotted out routes for vessels to follow using nautical charts and provided information to the crews in real time and that Membache hired, paid, and oversaw two crews, one dedicated to transporting and storing cocaine within Colombia, and one responsible for shipping the cocaine. *See id.* at 107:11–115:25.

## II.  DISCUSSION

The defendants have failed to rebut or materially undermine the evidence presented by the government establishing, by a preponderance of the evidence, that Murillo and Membache are disqualified for safety-valve relief.[8]  Murillo is ineligible for safety-valve relief because he

---

[8]      Courts have generally placed the burden on the defendant to establish eligibility for safety-valve relief. *See United States v. Rodriguez*, 676 F.3d 183, 191 (D.C. Cir. 2012) (citing *United States v. Mathis*, 216 F.3d 18, 29 (D.C. Cir. 2000)); *United States v. Aidoo*, 670 F.3d 600, 605–06 (4th Cir. 2012) (collecting cases); *accord United States v. White*, 1 F.3d 13, 18 (D.C. Cir. 1993) ("The defendant properly bears the burden of proof under those sections of the Guidelines that define mitigating factors." (internal quotation marks and citation omitted)).  At the same time, the Court is cognizant that this burden allocation has arisen in evaluating whether a defendant made a truthful and complete proffer. *See, e.g., Rodriguez*, 676 F.3d at 190–91; *Aidoo*, 670 F.3d at 605; *United States v. Sanchez*, 475 F.3d 978, 980 (8th Cir. 2007); *United States v. Marquez*, 280 F.3d 19, 23 (1st Cir. 2002); *Mathis*, 216 F.3d at 29; *United States v. Stephenson*, 452 F.3d 1173, 1179 (10th Cir. 2006); *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997); *United States v. Flanagan*, 80 F.3d 143, 146 (5th Cir. 1996); *United States v. Ramirez*, 94 F.3d 1095, 1100–02 (7th Cir. 1996) ("It is easy to understand why virtually all of the case law focuses on the fifth criterion, the only one which is not as clearly definable by objective data or by reference to other sections of the guideline."); *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir. 1996); *United States v. Adu*, 82 F.3d 119, 123 (6th Cir. 1996).  By contrast, the government typically bears the burden at sentencing to establish, by a preponderance of the evidence, the defendant's aggravated role or possession of a weapon in connection with the charged offense, which are the two safety-valve requirements at issue here. *See United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997).  The parties glide past the apparent conflicting burdens without discussion. *See* June 13 PM H'rg Tr. (Rough) at 221:11–222:22 (government counsel responding to the Court's question as to who has the burden of proof by stating, "I'm not aware of the case law on that point, Your Honor, and I'm not aware of it in D.C.  I couldn't say one way or [the] other.").  The Court concludes that the government has the burden of showing, by a preponderance of the evidence, a defendant's ineligibility for safety-valve relief due to supervisory role or weapon

had a supervisory role in the offense, and Membache is ineligible for safety-valve relief because he had a supervisory role in, and possessed a firearm in connection with, the offense. The offense, in this context, includes both the specific offense of conviction and "all relevant conduct." *See* U.S.S.G. § 5C1.2 app n.3 ("Offense," as described in subsection (a)(2)–(4), "mean[s] the offense of conviction and all relevant conduct.").[9] Contrary to the defendants' challenges to the government's evidence, for reasons discussed below, this evidence was sufficiently reliable and persuasive to conclude that the defendants are ineligible for safety-valve relief.

### A. Murillo and Membache had Supervisory Roles in the Offense

Both the statutory and Guidelines safety-valve provisions disqualify a defendant for relief when the defendant was either "an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines" or was "engaged in a continuing criminal enterprise, as defined in [21 U.S.C. § 848]." 18 U.S.C. § 3553(f)(4); U.S.S.G. § 5C1.2(a)(4). The disqualifying role of "'[o]rganizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines,'. . . means a defendant who receives an adjustment for an aggravating role under § 3B1.1 (Aggravating Role)." U.S.S.G. § 5C1.2

---

possession and the defendant may sustain his burden of persuasion to show eligibility for safety-valve relief by refuting that evidence or showing that the government's evidence is incomplete, inaccurate or otherwise unreliable. *Accord United States v. Archer*, 671 F.3d 149, 173 (2d Cir. 2011) (concluding that where one party must "prove a negative," the opposing party "assume[s] a burden of production of evidence that presents at least a triable issue as to the fact at issue," at which point the party responsible for proving the negative assumes the burden of persuasion); *see also United States v. Valdovinos-Soloache*, 309 F.3d 91, 94 (2d Cir. 2002) (per curiam) ("Generally, the government bears the burden of proving facts relevant to sentencing. . . . [h]owever, the party seeking to benefit from a particular fact or facts often bears the burden of persuading the court.").

9    Murillo filed a motion *in limine*, which Membache joined, seeking to preclude the government from presenting "relevant conduct" evidence at the hearing. *See* Def.'s Mot. *in Limine*, ECF No. 276 (Murillo's motion); Def.'s Reply to Gov't's Opp'n to Mot. *in Limine* at 1 n.1, ECF No. 280 (Membache's motion to join); Rough Transcript of Hearing (June 6, 2019) ("June 6 H'rg Tr. (Rough)") at 3:8–20 (Court granting Membache's motion to join). The defendants' motion *in limine* was denied for reasons explained orally at the evidentiary hearing in light of the text of the Guidelines, which explicitly define "offense" to include "relevant conduct," as well as governing case law on the scope of relevant conduct, and the ample time provided to the defendants to prepare for the evidentiary hearing. June 12 H'rg Tr. at 12:10–26:19; Min. Entry (June 12, 2019).

app. n.5.  If the government demonstrates that the defendants were organizers, leaders, managers, or supervisors of any other person in connection with the offense, the defendants cannot meet the first prong of U.S.S.G. § 5C1.2(a)(4), and consideration of the second prong, concerning a continuing criminal enterprise, is unnecessary.  *Id.* § 5C1.2 app. n.6 (confirming that "[a]s a practical matter, it should not be necessary to apply this prong of subsection (a)(4)," referring to the § 848 continuing criminal enterprise prong).

The government focused its evidence on proving that the defendants were "managers or supervisors," rather than  "organizers or leaders."  In distinguishing a leadership and organizational role from one of mere management or supervision, the following factors, listed in U.S.S.G. § 3B1.1 app. n.4, are relevant: (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.  *See United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014) (quoting U.S.S.G. § 3B1.1 app. n.4).  No single factor is dispositive. *Id.*  An enhancement under U.S.S.G. § 3B1.1 requires only some "proof that [the defendant] was hierarchically superior to [his] co-conspirators."  *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004).

As the D.C. Circuit explained in *Quigley*, "the concept of 'control' or 'authority,' implicit in the notion of 'management' or 'supervision' . . . connote[s] some sort of hierarchical relationship," *id.*, and U.S.S.G. § 3B1.1(b), concerning managers and supervisors, "sweep[s] in lower level managerial and supervisory conduct," *id.* at 139, whereas U.S.S.G. § 3B1.1(a) "encompass[es] higher level managerial and supervisory conduct," *id.*  More than one person

may qualify as a leader or organizer of a criminal association or conspiracy. U.S.S.G. § 3B1.1, app. n.4. Therefore, both Murillo and Membache may be deemed managers or supervisors in the same offense. Moreover, even if the defendants were supervised by others, they may still qualify as managers or supervisors by exerting sufficient control over another participant in the conspiracy. *See United States v. Vega*, 826 F.3d 514, 538–39 (D.C. Cir. 2016) (per curiam). A "participant," in turn, is someone who is criminally responsible for the commission of the offense, even if they were never charged with or convicted of the offense. *Id.*; U.S.S.G. § 3B1.1 app. n.1.

The government established by a preponderance of the evidence that Murillo and Membache both had supervisory roles in the charged offense. Souchet summarized the evidence concerning the *Mistby* conspiracy and the defendants' roles and actions in connection with that conspiracy based on his experience in the investigation and his review of post-arrest interviews of five cooperating defendants, *see* June 12 H'rg Tr. at 27:7–33:9, 35:16–38:4, 39:17–54:20, 56:3–58:11, three of whom were co-conspirator crewmembers on the *Mistby*, *see id.* at 50:2–51:19. The details of these interviews were corroborated, in material respects, by phone calls intercepted by the CNP, *see id.* at 52:16–53:22, 116:1–117:2, which provided surveillance reports about the identities of persons intercepted, *id.* at 119:9–121:22, 124:24–127:20; Souchet Decl. ¶¶ 7–15 & n.3; *supra* n.7 (reviewing the government's foundation for the speaker attributions on the intercepted calls and transcripts).

Souchet explained that the conspiracy was led by Obando and Tello, June 12 H'rg Tr. at 47:20–48:10; June 13 PM H'rg Tr. (Rough) at 139:1–9, who relied on Murillo to serve as a mid-level manager and to give instructions to lower-level members of the DTO, particularly with regard to the timing of launches and the routes the go-fast vessels should take to avoid detection

by law enforcement, and relied on Membache to serve as the "logistics manager" and to supervise others, including his younger brothers, in moving and storing cocaine inside Colombia and in loading that cocaine onto go-fast vessels for shipment. *See* June 12 H'rg Tr. at 36:17–39:15, 48:18–49:12 (Souchet's summary, based on his review of the investigation, of Murillo's role); *id.* at 32:12–33:9, 35:16–36:14, 48:21–49:5 (Souchet's summary, based on his review of the investigation, of Membache's role). The information underlying Murillo's role in supervising others on the timing and routes of vessels carrying illegal narcotics and Membache's role in supervising others on the movement, storage, and loading of cocaine is reviewed below.

### 1. Murillo's Supervisory Role

Turning first to Murillo, three witnesses, an intercepted phone call, and Murillo's own admissions in connection with his plea corroborate that, with respect to the *Mistby* and other schemes to transport narcotics via go-fast vessels, Murillo obtained information from Rendon regarding the locations of law enforcement patrols, used the coordinates from Rendon to plot safe routes on nautical maps and program GPS coordinates for the go-fast vessels, and directed go-fast crews to follow those specific routes. *See id.* at 36:17–37:19, 48:12–49:12. With respect to the *Mistby*, Paredes, the captain of the *Mistby*, *id.* at 57:10–15, told law enforcement in post-arrest interviews that Murillo was responsible for providing coordinates to allow the *Mistby* crew to travel safely, instructed the crew whether to launch the *Mistby* based on Rendon's information, and played a similar role with respect to other shipments of illegal narcotics on-board vessels. *See id.* at 60:19–62:6.

This information is further corroborated by the Statement of Facts incorporated into Murillo's signed plea agreement, in which the defendant admits that he obtained coordinates of law enforcement patrols, placed those coordinates in a nautical chart, and used that information to direct go-fast vessels. *Id.* at 38:8–39:14; Murillo SOF ¶ 2 ("The Defendant was responsible

for learning of military and law enforcement maritime activity along the Pacific Coast of Colombia. The Defendant used this information to determine the maritime routes that the DTO's go-fast boats would use in transporting drugs on the high seas in order to avoid detection and potential seizure, which included mapping (plotting) the maritime routes and drawing the location of law enforcement's maritime assets."). In an intercepted phone call, Andres, a crewmember of the *Mistby,* tells Obando that he (Andres) is waiting for Murillo to give the order to launch the *Mistby,* confirming Murillo's role. *See* June 13 AM H'rg Tr. at 63:15–64:13 (Souchet discussing Gov't's Ex. 12, transcript of a June 18, 2012 intercepted conversation between Obando and Andres).

That Murillo played this role with respect to the *Mistby* is bolstered by his role in other shipments. For example, Pozmino, a crewmember of an unnamed go-fast vessel interdicted in March 2012, before the interdiction of the *Mistby*, told law enforcement, over the course of six interviews spanning from March 29, 2012 through February 3, 2015, that he had observed Murillo, at a planning meeting prior to the launch the March 2012 interdicted vessel, plotting locations of naval patrols using nautical charts and a GPS he brought to the meeting and using that information to create a route for safe passage of the vessel, and that Murillo communicated directly with the "dispatcher"—the person who gave the orders to depart—and gave real-time coordinates for the route. *See* June 12 H'rg Tr. at 80:23–89:2. On this March 2012 shipment, Pozmino stated that when the crew saw a law enforcement aircraft, they called Murillo to confirm the route and turned back. *Id.* at 87:19–88:25. Murillo then ordered them to go out again, and provided a new route. *Id.*

Likewise, Gonzalez, a cousin of defendant Membache and a crewmember of another go-fast vessel, *La Kokira*, which was interdicted in February 2012, also before the interdiction of

the *Mistby*, stated, in post-arrest interviews between 2012 and 2015 (one of which Souchet attended), that he had observed Murillo, at a planning meeting prior to the launch, plotting out a safe route for passage using nautical charts, and providing the coordinates for the February 2012 shipment. *Id.* at 107:11–114:8. When the crew of *La Kokira* saw a law enforcement patrol, they called Murillo to get a new route, because, according to Souchet's review of law enforcement interviews, a go-fast crew does not have authority to alter a route once the route has been set. *Id.* at 112:19–113:13.

In addition to the evidence that Murillo served as the "navigator" of the *Mistby* and other vessels carrying illegal narcotics shipments, statements by two witnesses and four intercepted phone calls corroborate that Murillo had an ownership interest in marijuana transported on the *Mistby*. Paredes told law enforcement that he had attended "several planning meetings" related to the *Mistby*'s launch and "heard [Murillo's interest in the marijuana] discussed with Obando[]." *Id.* at 58:13–20. Andres, in a September 5, 2012 interview, told law enforcement that Murillo owned the marijuana on the *Mistby*, which was placed there to take the place of cocaine that had been seized by law enforcement prior to the *Mistby*'s launch. *Id.* at 72:23–73:14; *see also* Membache Post-H'rg Memo at 3 (summarizing a law enforcement interview in which Andres told Tello that Murillo had marijuana to send on the *Mistby*).

Intercepted phone calls corroborate these witnesses' statements regarding Murillo's ownership of the marijuana on-board the *Mistby*. Two phone calls capture Andres offering to connect Murillo with a buyer for the marijuana, and another conversation from that same day records Murillo and Membache discussing this potential sale. *See* June 13 AM H'rg Tr. at 57:13–59:21 (referring to Gov't's Exs. 8 and 9, both May 4, 2012 calls between Murillo and Andres discussing the sale of 620 units of "cilantro," which Souchet testified was code for

marijuana); *id.* at 59:22–61:20 (referring to Gov't's Ex. 10, a May 4, 2012 phone call between Murillo and Membache concerning the sale of 620 units, which, Souchet testified, matched the 620 units of "cilantro" in Murillo's prior conversations with Andres). In a subsequent intercepted phone call, Murillo explains to Tello that the *Mistby* shipment must be successful because of Murillo's ownership interest in some of the narcotics on board. *See id.* at 61:21–63:14 (Souchet testifying that in Gov't's Ex. 11, a May 18, 2012 conversation between Tello and Murillo, Murillo indicates that he told "him," a person Souchet believes to be Rendon, "we need to come to an agreement, because I also had something there. That [Rendon] knows if I'm successful . . .", which conversation Souchet interprets to indicate that Murillo needed the go-fast launch to be successful because he owned some of the merchandise on-board). Although the government never established that this ownership interest translated to a greater right to the share of any proceeds from the *Mistby* shipment, Murillo's conversations regarding *Mistby* cargo with Andres and Tello, both of whom all parties agree held leadership roles in the conspiracy, *see* Membache Post-H'rg Memo at 2, support Souchet's description of Murillo as a middle-manager with responsibility in coordinating aspects of the *Mistby* launch.

In response to this evidence, Murillo argues that: (1) his role in providing coordinates to the crew of the *Mistby* was limited to passing on to others information he learned from Rendon, and is more akin to the role of a meteorologist who plots weather patterns to help a rocket launch successfully rather than evidence that he played a supervisory role, June 13 AM H'rg Tr. at 124:16–138:16; June 13 PM H'rg Tr. (Rough) at 211:24–216:25; (2) the crew of the *Mistby* did not view Murillo as their boss, and Paredes felt that he could disregard Murillo's recommendation to launch since Obando and Tello were the leaders, June 13 AM H'rg Tr. at 138:20–139:22; June 13 PM H'rg Tr. (Rough) at 215:7–216:10; (3) Pozmino only described

Murillo's role in the March 2012 shipment after a series of interviews in which he named the dispatcher, not Murillo, as the person who gave orders, June 13 AM H'rg Tr. at 119:10–129:25; (4) whether Murillo owned or would receive any profit from the marijuana aboard the *Mistby* is doubtful, in light of Andres's statement, during an interview on August 31, 2012, that Tello and Obando would receive "half the profits that [Murillo] was going to earn" from the marijuana on the *Mistby*, *id.* at 107:22–109:22, and Paredes's statement, during an interview on September 6, 2012, that Tello purchased all of the marijuana prior to the launch of the *Mistby*, *id.* at 109:23–111:1; and (5) even if Murillo maintained any investment interest in the marijuana, the government failed to show how his ownership of marijuana gave him more control over the participants in the conspiracy, *id.* at 111:2–113:7; June 13 PM H'rg Tr. (Rough) at 212:11–213:2.  None of these arguments rebuts or undermines the government's ample proof that Murillo had a supervisory role.

For example, Murillo posits that, as a legal matter, a "navigator" of a ship does not serve as a manager or supervisor, and the label "captain" is the key to the supervisory role adjustment in other cases.  *See* Murillo Resp. at 1–2; June 13 PM H'rg Tr. (Rough) at 214:7–216:25.  The government argues to the contrary, pointing out that "courts in the Eleventh Circuit regularly apply role enhancements to captains or navigators when appropriate."  Gov't's Comprehensive Review of the Foundation for Identification of Speakers in Gov't's Exs. 5–14 at 3, ECF No. 290 (citing *United States v. Acuna-Acosta*, 334 F. App'x 197, 198 (11th Cir. 2009) (per curiam) (unpublished); *United States v. Ramirez*, 426 F.3d 1344, 1355–56 (11th Cir. 2005) (per curiam); *United States v. Rendon*, 354 F.3d 1320, 1331–33 (11th Cir. 2003); *Garcia-Estupinan v. United States*, No. 8:02-cr-435-T-24EAJ, 2008 WL 1995070, at *4–5 (M.D. Fla. May 7, 2008)).  Both the D.C. Circuit and Eleventh Circuit have cautioned that conclusory labels are no substitute for

an analysis of the degree of control a defendant had over other participants. *See, e.g.*, *United States v. Graham*, 162 F.3d 1180, 1183 (D.C. Cir. 1998) ("[C]onclusory labels are inadequate when assessing culpability under § 3B1.1."); *United States v. Guerrero*, 114 F.3d 332, 345–46 (11th Cir. 1997) (drawing a distinction between the label "pilot" and factors that actually "address the defendant's authority over other individuals involved in a criminal venture").

Although not binding, Eleventh Circuit precedent offers persuasive authority that Murillo's actions as a "navigator," who used special skills to direct other participants in order to help the overall organization succeed, would merit an aggravating role enhancement, even if Murillo did not control other aspects of the conspiracy or have an ownership interest in the contraband. *See, e.g.*, *United States v. Maciel-Macedo*, 485 F. App'x 382, 383–84 (11th Cir. 2012) (per curiam) (unpublished) (affirming supervisory role adjustment for defendant who "was given the authority to determine what vehicles *and what routes would be taken to ensure the safe delivery of the drugs*" and noting that "a defendant's subordinate role does not absolve him of his supervisory role when he coordinates and manages the delivery and transportation of drugs" (emphasis added) (citing *United States v. Jones*, 933 F.2d 1541, 1546–47 (11th Cir. 1991)); *Ramirez*, 426 F.3d at 1355–56 (11th Cir. 2005) (captain who knew the destination of a boat but did not choose this destination, and who was following instructions of other co-conspirators, was eligible for a role enhancement because he "was in charge of his four codefendants on the go-fast boat" and "alerted his codefendants to the presence [of] the Coast Guard"); *Jones*, 933 F.2d at 1547 (upholding role enhancement for defendant who "had the responsibility of ensuring that the contemplated smuggling venture would succeed" and "made unilateral decisions regarding landing and loading locations and the timing of such trips").

The D.C. Circuit has similarly observed that a defendant who "actually assigned [co-conspirators] where to go" is a factor that supports an aggravated role adjustment. *Vega*, 826 F.3d at 539 (internal quotation marks and citation omitted); *see also United States v. Khan*, No. 16-cr-96 (RBW), 2017 WL 3917002, at *6–7 (D.D.C. Sept. 5, 2017) (defendant who, among other activities, "coordinated . . . travel arrangements," for unauthorized aliens who "were directed to call the defendant if any problems arose during the journey" was deemed to "exercise[] sufficient control" for a role enhancement). Rather than being "simply a barnacle clinging to the outer hull of middle management," *Graham*, 162 F.3d at 1184, the evidence against Murillo demonstrates that he "provided guidance to senior managers or subordinates, issued . . . orders on behalf of the conspiracy, or otherwise held himself out as a link in the chain of command," *id.* Indeed, the D.C. Circuit has affirmed a managerial or supervisory role enhancement for a defendant who, like Murillo, participated in the planning of a drug-trafficking transaction, supervised numerous aspects of the illegal enterprise, and recruited or monitored participants. *See United States v. Borda*, 848 F.3d 1044, 1071 (D.C. Cir. 2017).

Murillo's other arguments do nothing to negate the conclusion that Murillo's role in plotting safe routes and directing crew members to follow those routes gave him control over participants and thus a supervisory or managerial role in the conspiracy. This control renders immaterial whether Murillo's one-time ownership of marijuana gave him any additional degree of control over the participants. Moreover, even if Paredes and Pozmino viewed Obando, Tello, and Andres as *additional* or *primary* supervisors, as long as the government has established that Murillo had control over at least one participant, this suffices to establish Murillo's supervisory role. *See Vega*, 826 F.3d at 538–39.

Accordingly, the government established by a preponderance of the evidence that Murillo had a supervisory role in the charged offense by managing or supervising at least one "participant" who was criminally responsible for an offense. *See id.* Murillo engaged in the planning of the *Mistby* launch, exercised decision-making authority for when the *Mistby* launch would occur, and communicated directions to the four crewmembers on the *Mistby* on the timing of the launch and the routes to take to avoid detection. Statements indicating that Murillo played this role with respect to other shipments, and that crew members called Murillo for real-time instructions and followed Murillo's advice and orders, offer further support for the conclusion that Murillo issued directions and exercised control over the actions of other co-conspirators.

### 2. Membache Had a Supervisory Role in the Offense

As for Membache, Souchet testified that three cooperating defendants, Pozmino, Gonzalez, and Paredes, described Membache's supervision of two crews, one responsible for moving cocaine from Buenaventura, Colombia, to Choco, Colombia, and one responsible for moving those drugs from storage in Choco to the go-fast vessels for shipment to Panama or elsewhere in Central America. June 12 H'rg Tr. at 32:12–33:9, 35:16–36:14, 48:12–49:5. Pozmino, who was a crewmember on an unnamed go-fast vessel interdicted in March 2012, explained that the first crew Membache oversaw included Membache's younger brothers, whereas the second crew consisted of individuals Membache hired for specific shipments. *Id.* at 99:21–104:11. Pozmino also stated, in a report, dated April 28, 2015, that he had known Membache for three years prior to Pozmino's arrest, that he and Membache both participated in a transfer of 15 kilograms of cocaine from one vessel to another in 2011, and that Membache was responsible for supervising that transfer and instructing the crew on transferring the

contraband between the two vessels. *Id.* at 92:12–104:11. Gonzalez, who is Membache's cousin and was a crewmember of *La Kokira*, which was interdicted in February 2012, explained, in the course of post-arrest interviews that took place from 2012 through 2015 (in one of which interviews Souchet participated), that Membache hired, paid, and oversaw two crews, one dedicated to transporting cocaine from Buenaventura to Choco, and one responsible for shipping the cocaine to Panama or elsewhere, and that Membache oversaw the storage of the cocaine prior to its shipment to Panama. *See id.* at 108:12–112:4, 114:10–115:25.

Paredes, the captain of the *Mistby*, told law enforcement that Membache oversaw the transportation of the cocaine that would be placed on the *Mistby*, oversaw the storage of that cocaine within Choco, including by supervising Nestor Murillo-Vanoy ("Vanoy"), who guarded the cocaine, and gave advice and instructions as to whether it was safe to launch the *Mistby* and whether to load or unload narcotics from the vessel. *Id.* at 58:21–59:5, 60:8–61:15, 62:7–64:24. These statements are corroborated by Campaz, a *Mistby* crewmember, who told law enforcement that he observed Membache give orders to the crew (but not to him specifically) regarding loading or unloading drugs from the *Mistby*, and that Membache instructed the *Mistby* crew not to depart on an occasion when he became aware of active military patrols along the planned route. *Id.* at 68:17–69:15, 71:3–15.[10] Campaz further told law enforcement, in an April

---

[10] The government's questions regarding Membache's orders to "conceal" the drugs on the *Mistby* were egregiously leading to the point of being misleading. *Compare* June 12 H'rg Tr. at 69:2–7 (government counsel asking Souchet whether Campaz stated that Membache "gave the instructions regarding where to conceal the drugs"), *with id.* at 70:17–71:15 (Souchet, in response to the Court's questions, clarifying that Campaz "did not get into detail [as to Membache's instructions about concealing the drugs]. . . . [Campaz] said in the report that [Membache] directed [the *Mistby* crew] to store [the narcotics] aboard the . . . *Mistby* but never gave specifics as to how"). Indeed, Membache's defense attorney introduced a photograph of the *Mistby* upon its interdiction, Membache Ex. 1, noting that the *Mistby* was a fairly small vessel with no covered or roofed area, raising an obvious question about how much "instruction" would be necessary to "conceal" the cocaine, given the limited area on-board to store any contraband. *See* June 13 PM H'rg Tr. (Rough) at 144:7–145:24 (Souchet agreeing with Membache's attorney's statement that "it seems pretty elemental where the drugs would go" as "there aren't too many places to hide the drugs on the *Mistby*").

20, 2016 interview, that Membache gave orders to remove drugs from the *Mistby* and have them stored in the jungle. June 13 PM H'rg Tr. (Rough) at 200:14–202:21.

Membache argues that his brother Andres could be considered a manager or supervisor in the offense, but not him. *See id.* at 149:11–150:21, 152:5–153:9, 156:4–160:17; *see also* Membache Post-H'rg Memo at 2–6, 12–17. According to Souchet, Paredes, who indicated that he was familiar with Membache's role in drug trafficking prior to the *Mistby*, June 12 H'rg Tr. at 62:7–63:17, viewed Membache's relationship with Andres as "competitive," and explained that Andres would at times overrule Membache's orders, particularly in situations in which Andres was on board the go-fast vessel but Membache was not. *Id.* at 59:6–18. For example, Souchet indicated that Paredes referred to a disagreement between Andres and Membache as to whether the *Mistby* should launch, but Andres eventually came to the same conclusion as Membache. *Id.* at 59:20–60:11. Nevertheless, both Paredes and Campaz told law enforcement that Membache had more authority in the DTO than Andres because Membache had more years of experience. *Id.* at 63:13–17 (Paredes); *id.* at 69:12–15 (Campaz).

Souchet also testified that Andres, on September 5, 2012, told law enforcement that Membache recruited him into drug trafficking in 2009 and assisted him in supervising their two younger brothers in transporting cocaine from Buenaventura to Choco. *Id.* at 71:16–73:14. Yet, less than two months later, on October 22, 2012, Andres denied that Membache had any role in the *Mistby* shipment. *Id.* at 73:16–74:9, 75:14–78:2.[11] For the reasons noted, *supra* in Part I, Andres's recantation is simply not credible in light of Membache's own admissions and concessions during his plea. *See* Membache SOF ¶ 2. In addition, intercepted calls corroborate

---

[11] Souchet surmised that Andres's retraction may have occurred in response to a phone call Membache made to Andres after Andres's arrest, but offered no corroboration to support this speculation. June 12 H'rg Tr. at 78:7–80:21.

the cooperating defendants' testimony regarding Membache's control over his two younger brothers and role in the *Mistby* launch. Specifically, the government submitted transcripts of intercepted calls in which Andres and Membache discuss the arrest of their two younger brothers and Membache indicates to Andres that they should "put the blame on just one of them," referring to the brothers, so that one brother can be released. June 13 AM H'rg Tr. at 44:18–55:7; Gov't's Exs. 5–7. The government also introduced an intercepted call in which Andres tells Membache that "Chino," a nickname for Paredes, indicated "one more day" before the launch. June 13 AM H'rg Tr. at 55:10–56:20; Gov't's Ex. 7.

Notwithstanding this evidence, Membache's defense attorney contends, *inter alia*, that: (1) Paredes was recruited and paid by Obando, had a direct line to him with no need to go through Membache, "never stated that he had spoken directly to [Membache]," and only indicated, in the last of his interviews, years after his arrest, that Membache attended any meetings with respect to the *Mistby*, June 13 PM H'rg Tr. (Rough) at 140:2–144:6, 155:18–25; Membache Post-H'rg Memo at 9–16 (arguing that Paredes's statements regarding Membache are not credible); (2) Paredes initially said Andres, not Membache, oversaw the transportation of cocaine within Colombia and its loading onto the *Mistby*, June 13 H'rg Tr. (Rough) at 149:11–150:16, and also said that Andres was in charge of the planning meetings, *id.* at 155:21–157:15; (3) Campaz originally said that Andres, not Membache, was in charge of making decisions regarding the *Mistby*, *id.* at 158:12–23; (4) neither Paredes nor Campaz had adequate personal knowledge of Membache's activities, since both "admitted to participating in multiple boat trips with various suppliers, with each other, and with other persons, including Andres . . . and other of the named defendants," but "none of those earlier drug trafficking activities had been with [Membache]," Membache Post-H'rg Memo at 10–11 (emphasis omitted); (5) Andres was paid

by Obando and Tello, rather than by Membache, June 13 PM H'rg Tr. (Rough) at 145:25–146:23; Membache Post-H'rg Memo at 3–5; (6) Andres told law enforcement that he had been recruited and paid by Obando and recommended that Obando hire his two younger brothers, June 13 PM H'rg Tr. (Rough) at 179:7–24; Membache Post-H'rg Memo at 3–5; (7) no texts from Obando or Tello to Membache were produced, and there are no intercepted conversations between Membache and the cocaine suppliers, or between Membache and the other *Mistby* co-conspirators who allegedly moved or stored cocaine, even though a text does exist from Tello to Rendon, June 13 PM H'rg Tr. (Rough) at 147:2–20, and conversations exist between other *Mistby* co-conspirators and Andres or Obando, Membache Post-H'rg Memo at 7–8; (8) any concern Membache felt over his brothers' arrest could have been brotherly concern and a desire to find a practical solution, rather than evidence that Membache supervised his brothers' drug-trafficking activities, June 13 PM H'rg Tr. (Rough) at 171:16–172:16, 233:21–234:9; Membache Post-H'rg Memo at 8–9; (9) evidence that Andres and Murillo discussed the purchase of marijuana for the *Mistby,* without consulting Membache, suggests that Membache was "out of the loop" as to that aspect of the launch, June 13 PM H'rg Tr. (Rough) at 177:9–24; Membache Post-H'rg Memo at 8 ("In every call introduced by the Government, [Membache] is unaware of what the others are doing, asking what the person means or what he is talking about and always defers to the judgment of others."); and (10) Gonzalez told law enforcement that Membache had "retired" from drug trafficking in 2009, June 13 PM H'rg Tr. (Rough) at 186:13–187:11.

Membache particularly targets the information provided by Paredes, pointing out that it was not until the fourth interview that Paredes mentioned Membache, not until the seventh and eighth interviews that Paredes described Membache as having a supervisory role or being

present at a planning meeting, and not until his eighth interview that Paredes ever mentioned

seeing Membache with a firearm. Membache Post-H'rg Memo at 12–18.[12] Yet Paredes's

statements, though they may at times focus on different members of the conspiracy, are not in

fact inconsistent as to Membache's role. Even if Paredes was under the impression that Andres

had more of a supervisory role as to the *Mistby* than Membache, the information he provided

still demonstrates that Membache *also* had such a role, and corroborates similar information

from other cooperating defendants.

Despite this vigorous effort to poke holes in the government's evidence, and irrespective

of whether Andres had more significant authority than Membache regarding the *Mistby*

shipment—an argument that Membache spends a significant portion of his post-hearing memo

addressing, *see* Membache Post-H'rg Memo at 3–6, 12–17—these arguments side-step the

consistent information provided by three witnesses that Membache had responsibility for

supervising others in the storage and movement of the cocaine that ultimately was loaded onto

the *Mistby*. This information about Membache is corroborated by intercepted phone calls

between Andres and Membache discussing drug-trafficking activity that support the

government's description of Membache's role in supervising his younger brothers and others in

coordinating the transport and safeguarding of cocaine within Colombia for export on go-fast

vessels. *See Borda*, 848 F.3d at 1071 (supervisory role is appropriate when evidence indicates

that the defendant supervised numerous aspects of the enterprise and monitored other

---

[12]    Membache also alleges that Pozmino indicated someone had "researched" Membache's name on his behalf, and that Campaz and Paredes discussed the conspiracy after they were arrested. Membache Post-H'rg Memo at 11–12. Membache insinuates that these facts suggest a coordinated effort among cooperating defendants to exaggerate Membache's role in order to obtain sentencing reductions for themselves. *Id.* This speculation was also raised, without elaboration, during the evidentiary hearing. *See* June 13 PM H'rg Tr. (Rough) at 149:1–10, 166:16–167:1, 190:18–25, 230:6–21, 236:17–24. Such unadorned speculation offers insufficient reason to disregard cooperating defendant statements that are corroborated by other statements and supported by intercepted phone calls and other evidence in this case.

participants).  Thus, even if Membache and his brother Andres shared supervisory responsibilities, or, indeed, even if Andres supervised Membache, Membache nevertheless exercised control and direction over other co-conspirators, which is sufficient to establish a supervisory role for Membache.  The additional evidence that Membache presents, post-hearing, that Andres *also* had supervisory authority over his brothers, or that other co-conspirators had greater supervisory roles than Membache, is accordingly of limited usefulness in deflecting the corroborated evidence that Membache played such a role himself.  *See, e.g.*, Membache Post-H'rg Memo at 12–17 (providing extensive detail on the criminal activities of Paredes and others, but failing to explain how those activities negate Membache's).

Also of similarly limited value, now, are Membache's attempts to relitigate the government's decision to indict him in the first place, his vacillations regarding his guilty plea, and the significance of a letter Murillo filed on July 26, 2016 (six months after the plea) stating that Membache was not involved in the conspiracy.  *See* Membache Post-H'rg Memo at 6–7 (referring to Ltr. from Murillo, dated July 26, 2016, ECF No. 240 (sealed)).  The simple rejoinder to each of these arguments is Membache's signed plea agreement, ECF No. 191, his Joint Statement of Facts incorporated into that plea agreement, ECF No. 192, and the fact that he has never indicated an intention to withdraw from that plea agreement—with good reason, *see* Mem. & Order, dated Nov. 30, 2018, at 5 n.1 (noting that the plea agreement caps each defendant's sentence at 120 months, as opposed to what the Probation Office calculated could be 262 to 327 months' imprisonment for Membache).  Membache's attempts to shake the foundation of his plea agreement while simultaneously relying on its shelter from a higher sentence are a distraction from the issue in focus on remand: whether Membache is eligible for safety-valve relief for a serious drug offense to which he entered a guilty plea.

In accordance with these findings, neither Murillo nor Membache is eligible for safety-valve relief because both defendants are managers or supervisors in the *Mistby* offense, as determined under the U.S. Sentencing Guidelines, and therefore fail to meet the requirements of 18 U.S.C. § 3553(f)(4).

### B. Membache Possessed a Firearm in Connection with the Offense

The government also contends that Membache is ineligible for safety-valve relief because he possessed a firearm in connection with the offense. *See* Gov't's Outline at 4, 7–8. In light of the conclusion that Membache was a manager or supervisor in the charged offense, consideration of whether he possessed a dangerous weapon is unnecessary, as he is already ineligible for safety-valve relief. Nevertheless, in light of the evidence presented, this requirement will be addressed.

In order to be eligible for safety-valve relief, the Court must find that "the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." U.S.S.G. § 5C1.2(a)(2). As noted, "offense," within the meaning of U.S.S.G. § 5C1.2(a)(2), means the offense of conviction and all relevant conduct. *Id.* § 5C1.2 app n.3. The term "defendant," as used in U.S.S.G. § 5C1.2(a)(2), "limits the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* § 5C1.2 app. n.4.

The D.C. Circuit has pointed out that, with regards to weapons possession, "the safety valve speaks in the active voice, requiring that 'the defendant' must do the possessing." *In re Sealed Case (Sentencing Guidelines' "Safety Valve")*, 105 F.3d at 1463. To be used "in connection with the offense," the firearm need only "facilitate, or have the potential of

facilitating, the drug trafficking offense." *United States v. Erazo*, 628 F.3d 608, 611 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *United States v. DeJesus*, 219 F.3d 117, 122 (2d Cir. 2000) (per curiam)). This standard "is satisfied when the government establishes, by a preponderance of the evidence, that the firearm 'served some purpose with respect to' the offense." *DeJesus*, 219 F.3d at 122 (internal quotation marks and citations omitted). In other words, "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Id.* (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993) (interpreting 18 U.S.C. § 924(c)(1))).

The government has presented reliable evidence that Membache personally possessed a firearm at a planning meeting related to the launch of the *Mistby*. Souchet reviewed the statements of Paredes, the captain of the *Mistby*, who said that he observed Membache with a dark 9mm pistol at a planning meeting prior to the launch of the *Mistby*. June 12 H'rg Tr. at 64:25–65:23. According to Paredes, Membache removed the magazine from the pistol, examined it, put the magazine back in the pistol, and placed the pistol back in his waistband, where it was concealed by his shirt. *Id.*

Although Membache argues that Paredes only mentioned seeing Membache with a firearm after eight interviews, June 13 PM H'rg Tr. (Rough) at 147:21–148:25, Membache Post-H'rg Memo at 17–18, the government, through Souchet, offered two additional pieces of evidence to corroborate Paredes's account. First, Campaz, a *Mistby* crewmember, told law enforcement that he was "streetwise" and saw what he believed to be the "silhouette" of a concealed pistol tucked into Membache's waistband at the launch site of the *Mistby*. June 12 H'rg Tr. at 69:16–70:12; *see also* June 13 PM H'rg Tr. (Rough) at 161:19–162:18 (Souchet clarifying that the term "silhouette" was his, and was not used by Campaz in the report); *id.* at

163:3–164:7 (Souchet explaining that Campaz had indicated that Membache was not present the day the *Mistby* launched, but "[t]here [are] times when [the] *Mistby* did not launch and . . . those drugs are constantly being moved to and from. . . . he saw it at the launch [site] that's it"); *see also* Membache Post-H'rg Memo at 8 (citing evidence that Membache was not at the site the day the *Mistby* launched or on a previous day when a launch was attempted). Thus, the statements of two *Mistby* crewmembers, Paredes and Campaz, corroborate each other as to whether Membache ever possessed a firearm in connection with the offense.

Second, Souchet explained that Paredes also discussed a particular small, white gun Andres owned, and that an intercepted phone call captures Andres discussing this gun with Vanoy. June 12 H'rg Tr. at 65:25–67:23. The government reasons that because Paredes's statement regarding Andres's firearm can be corroborated by an intercepted phone call, his statement regarding Membache's firearm is rendered more credible. *Id.* (government counsel arguing that "the fact that Luis Paredes's statements regarding [Andres's] ownership of the pistol are corroborated by the wiretap in this case [] makes it more credible that [Paredes] was providing honest information regarding the possession of a pistol by [Membache]"); *see also* June 13 AM H'rg Tr. at 72:8–73:9 (Souchet discussing Gov't's Ex. 14, a transcript of an April 23, 2012 intercepted call in which Andres tells Vanoy where to locate a small, white gun). This second piece of evidence, standing alone, would be too thin a reed to rest a finding of Membache's possession of a different firearm at a different time, but does bolster somewhat the accuracy of Paredes's recollections.

Moreover, as already established, Membache had a supervisory role in the *Mistby* offense, and played a role in safeguarding cocaine while it was transported throughout Colombia and loaded onto go-fast vessels for shipment elsewhere. Given this role in guarding the

narcotics, his firearm "ha[d] the potential of facilitating[] the drug trafficking offense." *Erazo*, 628 F.3d at 611 ("[T]he requisite connection with the underlying offense is established if the weapon was used or carried in order to protect contraband." (internal quotation marks and citation omitted)); *see also United States v. Schaper*, 903 F.2d 891, 896 (2d Cir. 1990) (holding, in interpreting U.S.S.G. § 2D1.1(b)(1), that when the defendant stored narcotics in his house and used the house to arrange narcotics deals, "[t]he presence of a weapon on [the defendant's] premises cannot be said to be unrelated to the ongoing narcotics trade").

Accordingly, Membache is ineligible for safety-valve relief not only because he had a supervisory role in the offense, but also because he possessed a firearm in connection with the *Mistby* conspiracy, and therefore fails to meet the requirement of 18 U.S.C. § 3553(f)(2).

Considering the record presented at the evidentiary hearing, as supplemented by post-hearing filings, the government has established by a preponderance of the evidence that Murillo and Membache were both managers or supervisors in the *Mistby* offense, and that Membache possessed a firearm in connection with the offense, and therefore neither defendant is eligible for safety-valve relief.

*        *        *

In the face of this collective evidence, the defendants' complaint that the evidence presented at the hearing was hearsay and unreliable falls short of rebutting the power of the corroboration of five different witnesses and intercepted phone calls. The law is clear that findings necessary for guideline determinations may be based on hearsay evidence. *See, e.g.*, 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence."); *United States v. Leyva*, 916

F.3d 14, 26 (D.C. Cir. 2019) ("The Sentencing Guidelines . . . expressly permit consideration of 'reliable hearsay.'" (quoting U.S.S.G. § 6A1.3 cmt.)); *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("[R]eliance [on hearsay] poses no legal problem.  Clear precedent permits hearsay to be used in sentencing decisions." (citing *United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007)).  Indeed, the D.C. Circuit recently reiterated that "[i]n resolving a factual dispute related to sentencing, the Guidelines permit a district court to 'consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.'"  *Leyva*, 916 F.3d at 24–25 (quoting U.S.S.G. § 6A1.3(a)); *see also* U.S.S.G. § 6A1.3 cmt. (authorizing reliance on "[o]ut-of-court declarations by an unidentified informant" "where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means").

The defendants further criticize the hearsay evidence as unreliable due to the incentives for defendants to cooperate with law enforcement and perceived inconsistencies in the statements of cooperating defendants over the course of their interviews.  Yet, as discussed in detail, *supra*, sufficient indicia of reliability are present in this case because the statements of the cooperating defendants corroborate each other as to the material facts at issue: the defendants' supervisory roles with respect to the *Mistby* and other illegal narcotics shipments, and Membache's possession of a gun.  For each eligibility requirement, it is possible to "rely only upon facts substantiated by more than one cooperator" in determining whether the government has met its burden.  *See Leyva*, 916 F.3d at 26 (citing *Jones*, 744 F.3d at 1367).  Even where the cooperating defendants had incentives to curry favor with law enforcement or where their statements suggest slight inconsistencies over the series of interviews, those facts "do not

establish that it was implausible . . . to credit particular aspects of their testimony, especially where, as here, the cooperators offered mutually corroborative accounts." *Id.* (quoting *Jones*, 744 F.3d at 1367).

Lending more indicia of reliability to the cooperating defendants' statements is that these defendants provided information against their own penal interest about matters not implicating Murillo or Membache. It is a "commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994) (referring to FED. R. EVID. 804(b)(3)). "Even the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor." *Id.* at 603. Ironically, Membache made this point better than the government did at the hearing. The government gestured to the cooperating defendants' acknowledgement of prior criminal activity as one reason that their statements regarding the *Mistby* should be deemed credible without deigning to provide much detail as to that prior activity, only discussing it generally and in response to direct questions from the Court. *See, e.g.*, June 12 H'rg Tr. at 94:3–23 (Court explaining "[o]ne way to demonstrate that the hearsay testimony that you are putting in . . . [is] reliable is if the declarant has made a number of statements against penal interest. . . . You could leave it to cross-examination[] but the defense counsel may not want to help you out and make these statements more reliable"). Membache, by contrast, provides significantly more detail than the government did, noting that "Paredes, a former member of the Colombian military, admitted that starting in 1995, he has transported tons of cocaine from Colombia to Panama and elsewhere for various suppliers and delivered to various persons but he had never worked with [Membache]." Membache Post-H'rg Memo at 10–11 (footnote omitted); *see also* June 13 PM

H'rg (Rough) at 187:15–25. "Though not as extensively[,] Campaz[] also admitted to participating in several transports of cocaine." Membache Post-H'rg Memo at 11. Membache makes this point to argue that "[i]n contrast to the detailed references to prior drug transportations and to their activities and that of other defendants in the *Mistby*, [] references to [Membache] were scant and lacking in detail." *Id.; see also id.* at 12–14 (detailing information Paredes shared about other drug traffickers). Yet, it is hard to see why a co-conspirator's more detailed knowledge of his own criminal activity compared to another individual's negates what knowledge he does have about that individual. Unwittingly, perhaps, Membache's acknowledgement that Paredes and Campaz shared extensive detail about their criminal history *bolsters* rather than hurts their credibility. Recognizing, of course, that a custodial statement that admits guilt *and* implicates another person may fail to qualify as "against [self] interest," *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 971 (D.C. Cir. 2016), Paredes's and Campaz's recitation of their own criminal histories only serves to bolster their credibility and provide further corroboration for the information relating to Membache and Murillo.

## III.  CONCLUSION

Upon finding, based on evidence presented at the evidentiary hearing on June 12, 2019 and June 13, 2019, and the entire record in this case, that the government has established, by a preponderance of the evidence, that the defendants Alfredo Mosquera-Murillo and Antonio Moreno-Membache exercised a supervisory role in the charged conspiracy and that the latter defendant possessed a weapon in connection with the same conspiracy, the objections raised by the defendants Alfredo Mosquera-Murillo and Antonio Moreno-Membache to the government's evidence are **DENIED**. Accordingly, the defendants Alfredo Mosquera-Murillo and Antonio

Moreno-Membache are not eligible for safety-valve relief under 18 U.S.C. § 3553(f) and

U.S.S.G. § 5C1.2(a).

**SO ORDERED.**

Date: July 11, 2019

_____
BERYL A. HOWELL
Chief Judge